IN THE SUPREME COURT OF NORTH CAROLINA

No. 306A20

Filed 1 September 2023

SOUND RIVERS, INC. and NORTH CAROLINA COASTAL FEDERATION, INC.

v.

N.C. DEPARTMENT OF ENVIRONMENTAL QUALITY, DIVISION OF WATER RESOURCES, MARTIN MARIETTA MATERIALS, INC.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 271 N.C. App. 674 (2020), affirming in part and reversing in part orders entered on 13 November 2015 by Judge W. Douglas Parsons in Superior Court, Beaufort County, and on 30 October 2017, 4 December 2017, and 20 December 2017 by Judge Joshua W. Willey, Jr. in Superior Court, Carteret County. Heard in the Supreme Court on 27 April 2023.

*Southern Environmental Law Center, by Geoffrey R. Gisler, Blakely E. Hildebrand, and Jean Y. Zhuang, for petitioner-appellees.*

*Joshua H. Stein, Attorney General, by Asher P. Spiller, Assistant Attorney General and Scott A. Conklin, Assistant Attorney General, for respondent-appellant.*

*Daniel F. E. Smith, Matthew B. Tynan, George W. House, Alexander Elkan, and V. Randall Tinsley, for intervenor-appellant.*

BARRINGER, Justice.

## I. Background

On 24 July 2013, the North Carolina Department of Environmental Quality, Division of Water Resources (Division) issued a National Pollutant Discharge

Elimination System Permit (Permit) to Martin Marietta Materials, Inc. (Martin Marietta). This Permit allowed Martin Marietta to discharge 12 million gallons of mining wastewater per day from Vanceboro Quarry into "tributaries of Blounts Creek." On 30 November 2016, an administrative law judge (ALJ) from the Office of Administrative Hearings affirmed the issuance of the Permit. The ALJ made voluminous findings of fact. *See Sound Rivers, Inc. v. N.C. Dep't of Env't Quality, Div. of Water Res.*, 271 N.C. App. 674, 682 (2020). Sound Rivers, Inc. and North Carolina Coastal Federation, Inc. filed a petition for judicial review with the superior court. The superior court reversed the ALJ's decision because the Division failed to "ensure reasonable compliance with the biological integrity standard." On 2 June 2020, the Court of Appeals reversed the superior court, holding that "the ALJ correctly determined the Permit was properly and validly issued in accord with applicable regulations." *Sound Rivers, Inc.*, 271 N.C. App. at 743. None of the ALJ's findings of fact were challenged on appeal to this Court.[1]

Given the unchallenged, binding findings of fact, the due regard the ALJ gave the factual matters within the Division's demonstrated knowledge and expertise, and the ALJ's plain language analysis of the biological integrity standard, we affirm.

---

[1] Although several of the ALJ's findings of fact were challenged on appeal to the superior court and Court of Appeals, all findings of fact went unchallenged on appeal to this Court. Thus, we as a reviewing Court, are bound by those findings. *See State v. Biber*, 365 N.C. 162, 168 (2011) (citing *State v. Baker*, 312 N.C. 34, 37 (1984)).

## II. Standard of Review

This Court reviews questions of law de novo. *Walker v. Bd. of Trustees of the N. Carolina Local, Governmental Employees' Ret. Sys.*, 348 N.C. 63, 65 (1998). Under de novo review, this Court's responsibility in this case is to review the statutory scheme and determine whether the ALJ and Court of Appeals correctly applied the law. *See id.* We agree with our learned colleague Justice Morgan's concurrence analyzing the missteps of the dissent regarding de novo review. As aptly noted in our concurring colleague's opinion, " 'a reviewing court is not free to weigh the evidence presented to an administrative agency and substitute its evaluation of the evidence for that of the agency.' *In re Appeal of McElwee*, 304 N.C. 68, 75 (1981) (citing *Appeal of AMP Inc.*, 287 N.C. 547, 562 (1975))." "[W]hen, as here, . . . findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal." *State v. Biber*, 365 N.C. 162, 168 (2011) (citing *State v. Baker*, 312 N.C. 34, 37 (1984)).

## III. Analysis

Subsection (a) of N.C.G.S. § 150B-34 provides:

> In each contested case the administrative law judge shall make a final decision or order that contains findings of fact and conclusions of law. The administrative law judge shall decide the case based upon the preponderance of the evidence, giving due regard to the demonstrated knowledge and expertise of the agency *with respect to facts and inferences within the specialized knowledge of the agency.*

N.C.G.S. § 150B-34(a) (2021) (emphasis added).

In this matter, "giving due regard to the demonstrated knowledge and expertise of the agency," the ALJ found that the biological integrity standard is within the "demonstrated knowledge and expertise" of the Division, administered by the Division, and within the Division's specialized knowledge "with respect to facts and inferences."[2] N.C.G.S. § 150B-34(a). Petitioners have not challenged these determinations or other related findings setting forth the experience and conduct of the Division's employees.

The ALJ decided this case based on the preponderance of the evidence and set forth its findings of fact and conclusions of law in a written order. The factual determinations by the ALJ are numerous, unchallenged, and binding. Thus, this Court cannot disturb them on review. *See State v. Biber*, 365 N.C. at 168.[3]

Specifically, the ALJ found, *inter alia*, that:

> 52. The preponderance of the evidence shows that, in evaluating and determining whether the [ ] Permit reasonably ensures compliance with the biological integrity standard, [the Division] (through its staff) applied its knowledge and expertise, and:
>
>> a. identified the Blounts Creek system, meaning Blounts Creek and its tributaries, as the appropriate "aquatic ecosystem";
>>
>> b. determined that the appropriate "reference

---

[2] The concurrence correctly focuses on section 150B-34(a)'s direction to give the agency's "facts and inferences" due regard.

[3] Our dissenting colleague has delved into the record, reweighed the unchallenged facts of the case, which included determining the credibility of expert testimony. This review is improper. *In re Appeal of McElwee*, 304 N.C. 68, 75 (1981) (citing *Appeal of AMP Inc.*, 287 N.C. 547, 562 (1975)).

conditions" were the existing conditions of the Blounts Creek system before the proposed discharge;

c.   studied and assessed the existing, pre-discharge ecological resources of the Blounts Creek system;

d.   determined the degree and geographic scope of potential physical and chemical impacts of the proposed discharge;

e.   determined the predicted changes to the ecosystem and ecological resources from the proposed discharge to be limited; and

f.   concluded that the effects predicted to occur as a result of the permitted discharge would not violate the standard, and, in fact, a violation would not occur unless the impacts to the Blounts Creek aquatic ecosystem were much greater in degree and geographic scope than those predicted to occur.

In reviewing whether the Division "failed to conduct a biological integrity analysis by inadequately sampling for 'species composition, diversity, population densities and functional organization' throughout the Blounts Creek aquatic ecosystem," the ALJ further found that:

60.   The determination and application of 'reference conditions' in a specific context is complex and requires significant expertise and judgment, and should be accorded deference.

61.   [The Division]'s interpretation and application of this term are reasonable, rational, and in accordance with the language and purpose of the biological integrity standard.

62.   To the extent [the Division]'s selection of appropriate 'reference conditions' is considered a factual

determination, it is one which falls directly within the agency's expertise and is therefore entitled to "due regard" pursuant to the APA.

63.  The preponderance of the evidence shows that Blounts Creek aquatic ecosystem's existing conditions ('reference conditions') are dynamic, vary over time and geographic locations, and can be affected by many environmental factors.

64.  The preponderance of the evidence shows that [the Division] had sufficient information such that the biological sampling efforts Petitioners sought were unnecessary.

65.  Before issuing the Permit, [the Division] determined that: (a) the proposed discharge likely would not cause significant erosion or sedimentation; (b) pH likely would not exceed 6.9 in the upper Blounts Creek and was unlikely to change significantly in lower Blounts Creek; (c) relative salinity impacts would likely be on the order of 1 ppt and salinities would remain within the variability of the system; (d) shifts in macrobenthic invertebrates would likely be toward an increase in diversity and would be geographically limited to the upper reaches of Blounts Creek; and (e) the proposed discharge is not likely to adversely impact fish communities of the Blounts Creek aquatic ecosystem. These determinations by [the Division] are reasonable and supported by the preponderance of the evidence.

66.  [The Division] determined that the likely effects of the permitted discharge are limited in degree, limited in geographic scope, and not deleterious.

67.  The preponderance of the evidence supports [the Division]'s conclusion and shows that the permitted discharge will not have any significant detrimental effect on the Blounts Creek aquatic ecosystem, including the many miles of C and Sw stream segments of other tributaries of Blounts Creek.

Thus, the ALJ acknowledged that, although terms used in the biological integrity

definition such as "species composition," "population densities" and "functional organization" are complex and technical, these terms have a plain meaning in the environmental regulatory context. The ALJ then found by a preponderance of the evidence that the Division properly applied its knowledge and expertise to that regulatory language and determined that it had sufficient information such that the biological sampling efforts sought by petitioners were unnecessary. The ALJ further found that the Division thoroughly evaluated compliance with the biological integrity standard before issuing the Permit.

Given the foregoing and other unchallenged findings of fact supporting these determinations, this Court should affirm the ALJ's final decision unless the ALJ's determinations were affected by an error of law.

The legislature has provided in N.C.G.S. § 150B-51(c) in relevant part:

> In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record. With regard to asserted errors [of law] . . . the court shall conduct its review of the final decision using the de novo standard of review.

N.C.G.S. § 150B-51(c) (2021).

Petitioners unsuccessfully attempt to frame their argument as one of legal error. Petitioners specifically contend that "[t]he Division failed to conduct the specific analysis required by the biological integrity definition." Yet, they concede that the regulations referencing and defining biological integrity do not address the

specific process for assessing compliance, and they further concede that the regulations list no procedures for sampling and collecting data to assess compliance.

Indeed, as conceded, a specific procedure for assessing compliance with the biological integrity standard is not set forth in the regulations. Rather, the regulations protect surface waters by establishing surface water classifications based on the best usage of surface waters. One such regulation affecting the surface water in this matter requires the "maintenance of biological integrity (including fishing and fish)." 15A N.C. Admin. Code 2B.0211(1) (Supp. Feb. 2023); *see also* 15A N.C. Admin. Code 2B.0220(1) (Supp. Feb. 2023).[4] Biological integrity "means the ability of an aquatic ecosystem to support and maintain a balanced and indigenous community of organisms having species composition, diversity, population densities, and functional organization similar to that of reference conditions." 15A N.C. Admin. Code 2B.0202(13) (Supp. Feb. 2023) (previously located at 15A N.C. Admin. Code

---

[4] While these regulations have been amended since the Division assessed and issued the permit, the relevant parts of these regulations for addressing the arguments on appeal have not changed. *See* 15A N.C. Admin. Code 2B.0211(1), (2) (2012) ("(1) Best Usage of Waters: aquatic life propagation and *maintenance of biological integrity* (including fishing and fish), wildlife, secondary recreation, agriculture and any other usage except for primary recreation or as a source of water supply for drinking, culinary or food processing purposes; (2) . . . Sources of water pollution which *preclude* any of these uses on either a short-term or long-term basis shall be *considered to be violating a water quality standard*." (emphases added)); 15A N.C. Admin. Code 2B.0220(1), (2) (2012) ("(1) Best Usage of Waters: any usage except primary recreation or shellfishing for market purposes; usages include aquatic life propagation and *maintenance of biological integrity* (including fishing, fish and functioning PNAs), wildlife, and secondary recreation; (2) . . . Any source of water pollution which *precludes* any of these uses, including their functioning as PNAs, on either a short-term or long-term basis shall be *considered to be violating a water quality standard*." (emphases added)).

2B.0202(11) (2012)). "Sources of water pollution that preclude [biological integrity] on either a short-term or long-term basis shall be deemed to violate a water quality standard." 15A N.C. Admin. Code 2B.0211(2) (Supp. Feb. 2023); *see also* 15A N.C. Admin. Code 2B.0220(2) (Supp. Feb. 2023). "No permit may be issued when the imposition of conditions cannot reasonably ensure compliance with applicable water quality standards . . . ."[5] 15A N.C. Admin. Code 2H.0112(c) (2022).

The language in the regulations above demonstrates that the ALJ's determinations were not affected by an error of law. Rather, the ALJ performed its own plain language analysis, which matched the Division's interpretation. Specifically, the ALJ properly determined that the Division's "interpretation [of the biological integrity rules] is longstanding, is reasonable, and is consistent with and supported by the plain language of the rules."

Using its plain language interpretation, the Division determined that a "permit complies with the biological integrity standard if the permit's terms and conditions reasonably ensure that the permitted discharge will not preclude maintenance of the ability of an aquatic ecosystem to support and maintain a balanced and indigenous community of organisms having species composition, diversity, population densities and functional organization similar to that of reference

---

[5] The relevant part of subsection (c) of this regulation currently in effect states: "No permit may be issued until the applicant provides sufficient evidence to ensure that the proposed system will comply with all applicable water quality standards and requirements." 15A N.C. Admin. Code 2H.0112(c) (2022).

conditions." The ALJ properly held that the Division complied with its interpretation of the biological integrity standard given the Division's expertise with respect to the facts and its conduct in its review of Martin Marietta's permit application.[6]

## IV.  Conclusion

We affirm the decision of the Court of Appeals. In this case, the ALJ properly made findings of fact, giving due regard to the demonstrated knowledge and expertise of the Division with respect to the facts, and then properly applied those facts to a correct interpretation of the regulatory plain language. Accordingly, we affirm the final decision by the ALJ as it relates to the biological integrity standard.

Martin Marietta raised several additional issues in their conditional petition to this Court. As to both issues raised, we hold that discretionary review was improvidently allowed.

AFFIRMED; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED.

---

[6] The dissent mischaracterizes our holding as the Division simply being entitled to deference. Instead, we reviewed whether the ALJ met the standard found in N.C.G.S. § 150B-34(a) ("The administrative law judge shall decide the case based upon the preponderance of the evidence, giving due regard to the demonstrated knowledge and expertise of the agency with respect to facts and inferences within the specialized knowledge of the agency.").

Nothing in our opinion should be understood to give the Division deference in its interpretation of 15A N.C. Admin. Code 2B.0202(11). The dissent engages in pejorative rhetoric and completely mischaracterizes our opinion before responding. Even a cursory reading of the dissent exposes its blatant misapprehension of our legal analysis as well as our application of the appropriate standard of review. On fourteen (14) separate occasions, the dissent mischaracterizes our analysis as deferring to the agency's legal interpretation. We have not. Constrained by our Constitutional duty to apply the rule of law and to comply with the legal standard of review, we review whether the ALJ's interpretations are consistent with the law. In this review, we determined, consistent with N.C.G.S. § 150B-34, that "the ALJ performed its own plain language analysis, which matched the Division's interpretation."

Justice BERGER did not participate in the consideration or decision of this case.

Justice MORGAN concurring.

I agree with my distinguished colleagues in the majority that the Court of Appeals decision should be affirmed in the lower appellate court's reversal of the trial court's determination that the administrative law judge erred in upholding the North Carolina Department of Environmental Quality's issuance of the discharge permit to Martin Marietta Materials, Inc. based upon the governmental agency's assessment that the biological integrity standard at issue was satisfied. I further agree with the members of the majority, along with my distinguished dissenting colleague, that the proper standard of review to be employed by the courts in this administrative law case is de novo review, as the challenge to the permit by Sound Rivers, Inc. and North Carolina Coastal Federation, Inc. is based upon asserted errors of law such that "the court shall conduct its review of the final decision [in a contested case] using the de novo standard of review." N.C.G.S. § 150B-51(c) (2021). While I agree with the majority's outcome that the final decision of the administrative law judge should be affirmed as to the Department's compliance with the biological integrity standard in issuing the permit and as to the "due regard to the demonstrated knowledge and expertise of the agency with respect to facts and inferences within the specialized knowledge of the agency" pursuant to N.C.G.S. § 150B-34(a), I write separately in order to identify, amplify, and emphasize certain aspects of this matter which merit attention. *See* N.C.G.S. § 150B-34(a) (2021).

The dissent here has admirably and exhaustively recounted facts, circumstances, descriptions, models, studies, results, analyses, concerns, evaluations, assessments, explanations, and opinions which were presented at the hearing, culminating with the dissent's view that the Department erred in its interpretation and application of the biological integrity standard in issuing the discharge permit. However, "a reviewing court is not free to weigh the evidence presented to an administrative agency and substitute its evaluation of the evidence for that of the agency." *In re Appeal of McElwee*, 304 N.C. 68, 75 (1981) (citing *Appeal of AMP Inc.*, 287 N.C. 547, 562 (1975)). The dissent also refers to the existence of "substantial evidence" in the record that lends support to the dissent's position that the Department incorrectly applied the biological integrity standard in the Department's decision to issue the permit. While the phrase "substantial evidence" is a term of art in administrative law which is embodied in N.C.G.S. § 150B-51(b)(5) and is customarily used when "the whole record standard of review" is employed as described in N.C.G.S. § 150B-51(c), nonetheless the dissent's focus on the quantity of the evidence bearing on the biological integrity standard in the instant case is noteworthy, even though de novo review governs the outcome. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curlee v. Johnson*, 377 N.C. 97, 101 (2021) (quoting *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 335 (2015)). In the case of *Thompson v. Wake County Board of Education*, this Court opined:

> The "whole record" test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*. On the other hand, the "whole record" rule requires the court, in determining the substantiality of evidence supporting the Board's decision, to take into account whatever in the record fairly detracts from the weight of the Board's evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.

292 N.C. 406, 410 (1977) (citation omitted). In the present case, to the extent that the dissent has identified an intersection between de novo review of this case and whole record review due to a focus on the existence of substantial evidence in the record, the law is clear that, while a reviewing court could reach a different result based on the evidence than the result reached by an administrative agency if the reviewing court was free to do so, nonetheless if there is substantial evidence to support the agency's decision, then the court must give deference to the specialized knowledge and expertise of the agency, including *facts and inferences* as directed by N.C.G.S. § 150B-34(a), and affirm the agency's determination. Here, although the dissent bemoans the majority's determination to uphold the administrative law judge's final decision that the Department properly issued the discharge permit, nonetheless the majority has correctly implemented the applicable statutory and appellate law, even in the face of the dissent's disapproval of the agency's inferences regarding its authority to issue the permit in light of the pertinent rules.

Chief Justice NEWBY, Justice BARRINGER and Justice ALLEN join in this concurring opinion.

Justice EARLS dissenting.

Blounts Creek is a beloved recreational watershed located in Beaufort County. Spanning about ten miles in length, Blounts Creek is unique in that it provides both fresh and saltwater habitats for its aquatic life. For approximately five miles, from its source to Herring Run, which is one of the creek's main tributaries, Blounts Creek is classified as fresh and swamp waters. This segment of the creek is known as Upper Blounts Creek. At Herring Run, Blounts Creek turns into a saltwater estuary and eventually flows into Blounts Bay. This segment is known as Lower Blounts Creek. The point at which the fresh and saltwater meet is called a salt wedge.

Precipitation and varying seasonal water flows are some of the primary forces that affect the position of the creek's salt wedge and its salinity. During periods of low precipitation, including during the summer months, the salt wedge moves farther upstream. During the winter, or after heavy rains, the water table rises, the flow from upstream is increased, and the salt wedge is pushed farther downstream.

Blounts Creek's mix of salt and freshwater allows the creek to foster rich and diverse aquatic life that varies season by season depending on water temperature and salinity. Over the course of the year, it is home to fish such as bass, bream, catfish, gar, puppy drum, black drum, spot, croaker, summer flounder, striped bass, speckled sea trout, raccoon perch, winter flounder, alewife, blueback herring, American and hickory shad, white perch, black crappie, eel, and red fin. The seasonal changes of

fish species in Blounts Creek make it a rare and popular fishery both for locals whose families have been enjoying the water's abundant resources for generations and for tourists from hundreds of miles away.

Much of Blounts Creek's aquatic life is highly dependent on the maintenance of the creek's salt and freshwater balance and existing water quality. But through a National Pollutant Discharge Elimination System (NPDES) Permit (the permit), the North Carolina Department of Environmental Quality, Division of Water Resources (the Division) has allowed Martin Marietta to discharge twelve million gallons of wastewater into this fragile ecosystem each day, threatening to transform Blounts Creek into a type of stream system that is "not normally found in North Carolina's coastal plain."

## I.  Legal Background

The Clean Water Act prohibits the release of pollutants into our waterways without the issuance of an NPDES permit. 33 U.S.C. § 1311(a). States can receive authorization to administer the NPDES permit program, and North Carolina has therefore assumed responsibility for issuing NPDES permits through the Division since 1975. Prior to issuing an NPDES permit, the Division must conclude that the permit will "reasonably ensure compliance with applicable water quality standards and regulations." 15A N.C. Admin. Code 2H.0112(c) (2012). As relevant here, surface waters in the state are safeguarded by regulations that classify various bodies of water based on their "best uses" and define certain conditions that must be

maintained to protect those best uses. *See, e.g.*, 15A N.C. Admin. Code 2B.0211(1) (2012).[1] As a freshwater segment, upper Blounts Creek from its source to Herring Run is assigned a Class C classification.[2] The regulation that sets forth water quality standards for Class C waters lists "maintenance of biological integrity (including fishing and fish)" as one of the best uses of such waters. *Id.* The regulation further provides that Class C waters

> shall be suitable for aquatic life propagation and maintenance of *biological integrity*, wildlife, secondary recreation, and agriculture. Sources of water pollution which preclude any of these uses on either a short-term or long-term basis shall be considered to be violating a water quality standard.

15A N.C. Admin. Code 2B.0211(2) (2012) (emphasis added); *see also* 15A N.C. Admin. Code 2B.220(2) (2012) (incorporating this standard for Class SB waters, which is applicable to lower Blounts Creek from Herring Run to Blounts Bay). Key to this appeal, the regulation requires that the "biological integrity" of Blounts Creek be maintained.

Biological integrity means "the ability of an aquatic ecosystem to support and maintain a balanced and indigenous community of organisms having species composition, diversity, population densities and functional organization similar to that of reference conditions." 15A N.C. Admin. Code 2B.0202(11) (2012). The majority

---

[1] These citations use the 2012 version of the administrative code that was in effect when the Division issued the permit.

[2] Upper Blounts Creek has supplemental classifications of Swamp Water and Nutrient Sensitive Water.

appears to reason that because "a specific procedure for assessing compliance with the biological integrity standard is not set forth in the regulations" themselves, the analysis undertaken by the Division here was sufficient to satisfy the biological integrity standard.

There is an insurmountable, tautological flaw in the majority's reasoning, as I understand it. In effect, it appears to me that the majority reasons that because the Division decided that the permit complied with the biological integrity standard, then the biological integrity standard must have been satisfied. But the Division's ultimate conclusion regarding the permit's compliance with the biological integrity standard is not in and of itself a valid basis from which to determine that the standard was applied. Though the terms set forth in the biological integrity standard are not specifically defined by regulation, they indisputably have meaning. It is this Court's duty to ensure that the Division indeed gave meaning to both the terms of the regulation and the regulation itself. It is not proper to simply take the Division at its word that the biological integrity standard has been met without any analysis or evaluation of the Division's legal interpretation.

## II.   **Standard of Review**

The Division's interpretation of the biological integrity standard is a question of law. We thus review it de novo. De novo review does not blind us to context or demand unquestioned deference to an agency's views. Though an agency's reading of a regulation merits "some deference," it is "not binding." *In re North Carolina Savings*

*& Loan League*, 276 S.E.2d 404, 410 (N.C. 1981). This Court instead weighs the "thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134,140 (1944)). And most relevant here, an agency's interpretation receives no deference if it is "plainly erroneous or inconsistent with the regulation." *Morrell v. Flaherty*, 338 N.C. 230, 238 (1994).

The majority and the concurrence alike fault this opinion for consulting evidence and "delv[ing] into the record." In my view, their approach to the proper scope of review is sparse to the point of being meaningless. If the Division says that the biological integrity standard means X, the majority seems to argue, our job is done. Any evidence elucidating that reading and the process by which the Division adopted it is, per the majority, beside the point. I disagree for at least four reasons.

*First*, "[f]acts found under a misapprehension of the law" do not bind a reviewing court. *Matter of Skinner*, 370 N.C. 126, 139, 804 S.E.2d 449, 458 (2017); *see also Helms v. Rea*, 282 N.C. 610, 620, 194 S.E.2d 1, 8 (1973) ("[F]acts found under misapprehension of the law will be set aside on the theory that the evidence should be considered in its true legal light."). So if the ALJ's factual findings sprang from a misreading of the biological integrity standard, this Court must assess them appropriately.

*Second*, in reviewing an agency's regulatory interpretation, we consider the

-20-

"thoroughness evident in its consideration" and the "validity of its reasoning." *In re North Carolina Savings & Loan League*, 276 S.E.2d at 410. If there were to be a fly-by-the-seat-of-the-pants reading by the agency—divorced from data and deliberation—it would bear less weight than a well-reasoned, evidence-backed interpretation. *See, e.g., N.C. Acupuncture Licensing Bd. v. N.C. Bd. of Physical Therapy Exam'rs*, 371 N.C. 697, 703 (N.C. 2018) (deferring to an agency's statutory interpretation in large part because it based its reading on an "extensive review" of "substantial studies and other evidence," including "scientific articles, reports, and books"). Despite the concurrence's view, that analysis does not "substitute" our "evaluation of the evidence for that of the agency." Instead, we weigh the agency's legal interpretation in light of the data it consulted and the procedures it employed.

Our review is like that of an engineer examining an architect's plans. Rather than opine on how she would design the building herself, the engineer probes the architect's work to ensure its soundness and reliability. If the math checks out and the structure is stable, the engineer should leave the blueprints undisturbed. But suppose that the architect's plans ignore the applicable building code, treating it as a suggestion rather than a command. Because the architect deviated from those rules—rules designed to create sound and safe buildings—his plans carry much less weight. In that case, the engineer—much like a reviewing court—can question the architect's judgment, not because she would have done things differently herself, but because his failure to follow the code imperils the building's safety and soundness.

The same principle holds true here. The Division's reading of the biological integrity standard renders it hollow in meaning and toothless in practice. By disclaiming any need to measure an ecosystem's "reference conditions" before granting a permit, the Division—much like the hypothetical architect—treats the standard like a suggestion rather than a command. In effect, the Division ignores the standard's mandate by reading it to impose no mandate at all. And so this Court—much like the hypothetical engineer—can probe the soundness of that judgment, not because we would have made a different choice, but because the Division sidestepped the law and the values it protects.

*Third*, and similarly, we review an agency's regulatory reading with an eye toward its practical consequences. That approach sounds in deep-seated principles of statutory interpretation and separation of powers. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 143, 147 (2000) (analyzing the consequences of the FDA's statutory interpretation in deciding whether that reading cohered with the statute's purpose and Congress' intent). More basically, it calls us to apply our "common sense." *See id.* at 133. When an agency's legal interpretation heralds far-reaching consequences—consequences that undercut the very purpose of the law it purports to interpret—a court may justifiably harbor doubts about that reading. *See In re Appeal of N.C. Sav. & Loan League,* 302 N.C. at 467-68 (rejecting agency's interpretation of the common bond requirement because adopting it would expand the "scope of eligible membership" to "no bounds," thereby subverting the legislature's

intent to craft a limitation).

We applied that principle most recently in *Werthington. See Wetherington v. N.C. Dep't of Pub. Safety,* 368 N.C. 583 (N.C. 2015). In that case, a State Trooper gave contradictory statements about how he lost his uniform hat. *See id.* at 586. His boss—Colonel Glover—fired the Trooper for violating the Patrol's truthfulness policy. *See id.* at 590. And as here, an ALJ upheld that decision, finding that Colonel Glover correctly interpreted and applied the law governing the discipline of State employees. *Id.* The problem: The Colonel misread the law and misunderstood when and why he could fire the Trooper. *Id.* In Colonel Glover's view, "any violation of the Patrol's truthfulness policy must result in dismissal." *Id.* at 593-94. On appeal, the Department of Public Safety defended his interpretation. *See id.* at 585. But this Court rejected the agency's reading. *Id.* Properly interpreted, the law obliged the Colonel "to exercise discretion" when disciplining employees. *Id.* at 594. And because Colonel Glover misapprehended his "discretion to consider the full range of potential discipline," his decision "was affected by an error of law." *Id.* at 591 (cleaned up).

That conclusion sprang from statutory language, our precedent, and—most relevant here—the implications of a per se dismissal rule. *See id.* at 594-96. An "inflexible standard deprives management of discretion," we noted. *Id.* at 596. And because the Patrol's truthfulness policy swept broadly—covering all potentially misleading statements on all potential topics—the Department's categorical reading of the law on employee dismissal entailed a "potentially expansive scope." *Id.* at 595.

All told, the Department's interpretation—and its real-world implications—clashed with the "flexible and equitable" disciplinary standard enshrined in the law, providing reason to question the agency's reading and the ALJ's affirmance of it. *Id.* at 595-96.

The same is true in this case. As *Werthington* made clear, the consequences of adopting an agency's legal interpretation bear on the deference we accord it. To that end, we can—and should—consult evidence about real-world effects. Here, much like the disciplinary policy in *Werthington,* the Division's regulatory reading carries "potentially expansive" consequences. *See id.* If the Division need not measure a biome's "reference conditions" before granting a permit, then the biological integrity standard is nothing but a husk. Judge Hampson made that very point in the decision below, recognizing that the Division's interpretation of the regulation gives it carte blanche to "functionally ignore" it. *See Sound Rivers, Inc. v. N.C. Dep't of Envtl. Quality, Div. of Water Res.*, 271 N.C. App. 674, 748 (2020) (HAMPSON, J., concurring in part and dissenting in part). And if the Division can so easily sidestep the water quality standards it is tasked with administering, the consequences for North Carolina's waterways could be apocalyptic.

For that reason, this Court should consider the sprawling implications of the Division's legal interpretation before endorsing it as a correct statement of the law. Consulting the facts is essential to that inquiry. If the Division properly interpreted the biological integrity standard in granting a permit to Martin Marietta—despite

evidence showing that the influx of wastewater will upend Blounts Creek and the habitats it shelters—then this State's water-quality regulations are little more than paper tigers. Before accepting that breathtaking read, this Court should confront the facts and grapple with their implications.

Finally, cases involving a State's environmental resources merit special care because of their far-reaching and irreversible consequences. *See, e.g., Massachusetts v. EPA,* 549 U.S. 497, 521-23 (2007) (relaxing the standing analysis when a State challenges federal environmental regulations in light of the danger posed by climate change to a State's land, natural ecosystems, and territorial integrity); *In re Maui Elec. Co.*, 150 Haw. 528, 538 n.15 (2022) (interpreting the State constitutional right to a "clean and healthful environment" to entail "a right to a life-sustaining climate system," and analyzing an agency's statutory authority in view of that right); *In re Hawai'i Elec. Light Co.*, 152 Haw. 352, 359 (2023) (examining an agency's statutory obligations in light of the irreversible risk posed by climate change to the State's resources and environment); *Held v. Montana*, No. CDV-2020-307, *35-46 (Mont. Dis. Ct. 2023) (documenting impact of climate change on Montana's natural resources and detailing the long-term harms to the State and its citizens).

Blounts Creek is a public waterway—it belongs to the People. *See* N.C.G.S. § 143-211 ("Recognizing that the water and air resources of the State belong to the people, the General Assembly affirms the State's ultimate responsibility for the preservation and development of these resources in the best interest of all its citizens

and declares the prudent utilization of these resources to be essential to the general welfare."); *see also* N.C. Const. art. XIV, § 5 ("It shall be the policy of this State to conserve and protect its lands and waters for the benefit of all its citizenry, and to this end it shall be a proper function of the State of North Carolina and its political subdivisions… to control and limit the pollution of our air and water….").

When pollution threatens the viability of a public waterway like the Creek, it threatens the People's stake in it, too. *See State ex rel. Rohrer v. Credle,* 322 N.C. 522, 527 (1988) (affirming that North Carolina's "[n]avigable waters" are "held in trust by the State for the benefit of the public"). That is especially true for fragile ecosystems like Blounts Creek's. As the Division's own environmental analyst made clear, even slight shifts in the Creek's salinity and water flow could overhaul its waters and stamp out the species that occupy them. And the impact of Martin Marietta's approved discharge–again, *twelve million gallons* of wastewater every day—is projected to be anything but slight.

That is especially concerning because environmental destruction is often irreversible. Poisoned waters are not easily healed. And even worse, the harms of pollution ripple across time and space, implicating the interests of current North Carolinians as well as future generations. While those alive today may have enjoyed the Creek's offerings, their children may not—and likely *will* not—have the same opportunity. Given the stakes involved—and the far-reaching consequences of our ruling—I would hesitate before adopting the Division's conclusory reading of law.

Before greenlighting the pollution of our waters, we should carefully consider the wisdom and legality of that course. Evidence supplies critical context to the Division's decision and its legal soundness—context we can and should consult when gambling with the People's resources.

III.    **Application**

A cursory review of the record reveals that the Division adopted an erroneous interpretation of the biological integrity standard, and thus failed to appropriately apply the standard before approving the permit. Several studies factored into the Division's conclusion that "the proposed discharge will have no likely significant adverse effects to aquatic life," which was the basis for its determination that the permit would comply with the biological integrity standard. These studies included its consultant CZR Incorporated's (CZR) Aquatic Habitat Assessment of the Upper Headwaters of Blounts Creek, a technical memorandum authored by another consultant, Kimley-Horn and Associates (Kimley-Horn), which was revised later and split into two separate reports, known as the water quality analysis technical memorandum and the flood and stability technical memorandum, and a final technical memorandum prepared by CZR that conducted a literature review assessing aquatic life likely to appear in Blounts Creek.

Before turning to the Division's flawed application of the biological integrity standard, it is worth noting that there was substantial evidence presented at trial that the methods employed by all of these studies and the conclusions drawn from

them are dubious. Among the studies that the Division relied on was the water quality analysis prepared by Martin Marietta consultant Kimley-Horn, which evaluated both salinity and pH in Blounts Creek. Though the evidence presented at trial pointed out potential errors with respect to both the salinity and pH analyses, concerns with respect to the salinity analysis are particularly glaring.

In conducting its salinity analysis, Kimley-Horn ran a model in which it evaluated the creek's salinity on a single day—April 13, 2012—by "add[ing] . . . discharge to the flow that they estimated on [that day]." Kimley-Horn itself explained that the model "only represents a snapshot in time," and it anticipated conducting additional testing to confirm their results, but it never did so. In any case, the Division relied on this analysis to conclude that the effect of the discharge from the quarry "would be a less than 1 part per thousand change in salinity."

Concerningly, however, the Wildlife Resources Commission—one of the Division's sister agencies with expertise in fisheries—conducted its own sampling and recorded salinity at 5.1 ppt. The Commission explained that "[t]hese data differences show the high variability of salinity that can occur in this system and demonstrate the importance of designing a baseline monitoring plan that captures the variability of critical water quality parameters such as pH and salinity annually as well as seasonally or during weather events." Similarly, the Division of Marine Fisheries—

another sister agency[3]—commented on Kimley-Horn's salinity analysis, explaining that the sampling did not "accurately describe yearly or monthly conditions. These sampling events should have been performed throughout the year over several years to adequately understand the effects of the discharge." Despite the counsel of its sister agencies with relevant expertise, the Division failed to ask Martin Marietta or Kimley-Horn to conduct this additional salinity sampling. No witness testified at trial regarding the nature of Kimley-Horn's model or the adequacy of the methods employed.

Before the permit was issued, Eric Fleek, the Division's own environmental supervisor in its biological assessment branch, raised concerns about the Kimley-Horn salinity analysis. Mr. Fleek warned that:

> Since they are linking all of those non-biological impacts on the salinity, I **ASSUME** there are good requirements in the permit which require them to carefully monitor changes in salinity. I have no clue what's in the permit, but I sure hope that requirement is in there because if the predicted salinity changes are greater than the estimates provided by Martin[ ]Marietta's consultants, then there could indeed be deleterious effects to estuarine biota. Salinity needs to be rigorously monitored for if it is not already.

In other words, Mr. Fleek was concerned that because the salinity analysis hinges entirely on a single day of sampling, if the results were inaccurate or unrepresentative, there could be significant consequences for Blounts Creek's aquatic

---

[3] Both the Wildlife Resources Commission and the Division of Marine Fisheries have statutory and regulatory authority over fisheries and marine fish, respectively, in the state.

life. But those tasked with formulating the permit did not follow up with Mr. Fleek or the biological assessment team about what this rigorous monitoring protocol would entail. Consequently, the permit only requires salinity to be monitored in the freshwater portion of the creek, even though Kimley-Horn's modeling analysis measured salinity in the creek's saltwater segment—an entirely different part of Blounts Creek. Further, Mr. Fleek testified that the rigorous monitoring requirements he was referring to included monitoring sites in the saltwater portion of the creek.

Officials from the Division who played a key role in the permit's issuance had little understanding of Kimley-Horn's model and its potential flaws. Tom Belnick, who formulated the final permit as the supervisor of the NPDES Complex Permitting Unit at the Division, testified that he did not know the error rate of the model employed by Kimley-Horn and admitted that the model was later revealed to be flawed. He also testified that Kimley-Horn's analysis cannot predict what the effect of the discharge would be on salinity levels during any other season or any other day of the year.

Tom Reeder, the director of the Division at the time the permit was issued, was responsible for approving the permit. Mr. Reeder testified that salinity "was the thing that [he] was really interested in," and that he relied on the Kimley-Horn analysis to inform his understanding of how the quarry discharge would affect the creek's salinity levels. But Mr. Reeder testified that, at the time he approved the permit, he

was not aware that the Kimley-Horn analysis was based on only one day of sampling or whether there was any follow-up testing performed to confirm the accuracy of Kimley-Horn's conclusion, and that he "[has] no idea what the model is based on." He did not know what time of the year Kimley-Horn collected samples nor did he know the range of salinity that Kimley-Horn observed. He did not even know that one of the samples that Kimley-Horn took generated an inaccurate salinity value.

The Kimley-Horn water quality analysis was not the only study upon which the Division relied in issuing the permit, of course. The Division also relied on two reports prepared by another Martin Marietta consultant, CZR. The first report CZR prepared, which was included in an appendix to Martin Marietta's permit application, is the Aquatic Habitat Assessment of the Upper Headwaters of Blounts Creek. The assessment sampled four locations in the headwaters of Blounts Creek over the course of a single day and "attempt[ed] to measure biotic integrity" with respect to species richness, total fish abundance, and percent tolerant individuals.[4] CZR also spent a single day sampling the benthic macroinvertebrate population as part of this assessment.

Like the Kimley-Horn Report, various weaknesses in CZR's assessment are worth noting. For example, the report did not conduct any aquatic habitat assessment in the saltwater portion of Blounts Creek, even though the aquatic life that requires

---

[4] The study did not attempt to evaluate species composition, diversity, functional organization, or population composition.

a saltwater habitat is thought to be particularly at risk from the twelve million gallons of water that may be discharged into the creek every day under the permit.

In addition, CZR's sampling of the stream's macroinvertebrate population conflicted with an analysis conducted by the Division's own biologists who analyzed the creek's benthic macroinvertebrates. In this internal report, Mr. Fleek explained that "there [was] a wide discrepancy in diversity between all of [CZR's] collections and [the Division's]." This conclusion was particularly concerning given that CZR took its samples during a time of year when "more favorable physical-chemical conditions" should have yielded a "more diverse pool of taxa." That CZR's analysis presented a potentially unduly narrow view of the diversity present in Blounts Creek is problematic because the purpose of the assessment was to predict the effect of the discharge on a representative range of aquatic life. But not only did CZR fail to conduct its analysis in the saltwater segment of the creek to determine the effect of the discharge on biota in that particular habitat, Mr. Fleek explained that CZR's sampling was not even representative of the biota present in the freshwater segment of the creek. What is more, the Division did not raise these discrepancies with Martin Marietta prior to the issuance of the permit, so these issues were never addressed. And Mr. Belnick, who, to repeat, was responsible for drawing up the final permit, never followed up with Mr. Fleek regarding his findings.

Mr. Fleek re-raised his concerns about CZR's macroinvertebrate sampling with Mr. Belnick a few months later, explaining that CZR "[had] real issues with the

collection and identification of invertebrates," meaning that CZR "consistently, and drastically, under report[ed] what was present (even though they had better physical-chemical sampling conditions)." Mr. Fleek went on to express that "in [his] opinion, if [the Division is] requiring ongoing biological monitoring, [it] need[s] to require that Martin Marietta retain a certified biological lab because what CZR collected is nowhere close to what [Mr. Fleek] found and their samples would fail [the Division's] standards of field and lab" quality control. Again, Mr. Belnick neither followed up with Mr. Fleek about this concern nor alerted Martin Marietta that the sampling was deficient. In a third email, Mr. Fleek wrote that CZR "will have to get certified to do [macroinvertebrates] or [Martin Marietta] will have to hire someone who knows what they are doing because, frankly, CZR is not up to it currently." Despite Mr. Fleek's repeated warnings that CZR's macroinvertebrate sampling was deficient, the Division forged ahead with issuing the draft permit without addressing these problems.

The Wildlife Resources Commission raised similar concerns about CZR's fish sampling—concerns with which the Division's biologists agreed. The Commission explained that Martin Marietta, through CZR's aquatic habitat assessment,

> submitted data from a single fish sampling event and determined that there would be no impacts to aquatic species with the project as proposed. We do not believe a one day backpack shocking and fyke net event can describe the ecology of this system. Important species such as striped bass and American eel, a federal species of concern, have recently been sampled in the system by others. Blueback herring may also be present, but due to low

> population numbers are difficult to find. Our concerns regarding the spawning of anadromous species cannot be addressed with the submitted sampling event due to the absence of egg, larvae, and juvenile sampling. In order to understand the impacts this proposed project may have on wildlife resources, we need multi-stage aquatic resource data from the site to better represent the extent of existing habitats and how they are utilized.

In short, the Commission called for additional fish sampling data, and biologists with the Division agreed with the recommendation.[5]

Similarly, at trial, Dr. Anthony Overton—an expert on fisheries management, fisheries ecology, larval fish ecology, and fish sampling methods and analysis—testified that a single day of sampling is insufficient to assess the makeup of the creek's aquatic life. He explained, for example, that "[j]ust one day of sampling," as CZR conducted here, "will not capture species composition or diversity" because "[they are] variable. You have species moving in and species moving out with respect to season." Dr. Overton also echoed the concern that CZR's methodology was inadequate to evaluate the biota of Blounts Creek because it was inordinately restricted in area.

As with the macroinvertebrate sampling, the Division never asked Martin Marietta to commission, nor did it ask CZR to conduct, additional fish sampling.

---

[5] The Division of Water Quality raised similar concerns, cautioning that "1-day of sampling does not provide sufficient information on downstream impacts" and that "sampling for young of year was conducted too early and should have been conducted in June or July." The Division of Marine Fisheries, which recommended that the permit application be entirely denied, also raised these concerns.

CZR's aquatic habitat assessment therefore represents the *only* fish sampling conducted prior to the issuance of the permit.[6]

To "make up for the inadequate sampling in the CZR report," Mr. Belnick testified that the permit added salinity monitoring at the two permitted water discharge points in the creek known as D1 and D2. But the information provided by these monitoring sites offers little insight into whether the biological integrity of the creek is being maintained. For example, CZR did not take any fish samples at the D2 monitoring point in compiling the report. This means that there is no way to know how changes in salinity are affecting the biological integrity of that area because there is no baseline to which subsequent population samples may be compared. Moreover, both salinity monitoring sites are located in the freshwater segment of Blounts Creek. So not only were no biological samples taken from the estuarine segment of the creek as discussed previously, but there will be no salinity monitoring at the part of the creek where saltwater life depends on the maintenance of a fragile saltwater habitat.

This is particularly concerning given Mr. Fleek's warning regarding the need for rigorous salinity monitoring requirements as quoted earlier. To repeat, Mr. Fleek wrote that he "**ASSUME[S]** there are good monitoring requirements in the permit which require [Martin Marietta] to carefully monitor changes in salinity . . . because

---

[6] The biological sampling that the Division's biologists conducted focused exclusively on benthic macroinvertebrates.

if the predicted salinity changes are greater than the estimates provided by Martin[ ]Marietta's consultants, then there could indeed be deleterious effects to estuarine biota." Yet the permit does not provide for salinity monitoring in the saltwater segment of the creek despite Mr. Fleek's insistence that such a monitoring site was highly important. There is no contrary evidence suggesting that limiting monitoring to the D1 and D2 sites is sufficient.

Following the aquatic habitat assessment, CZR prepared a technical memorandum on Martin Marietta's behalf. CZR did not conduct additional sampling in preparing this memo. Rather, it composed a literature review that "discusses what fish are out there and . . . provides tolerance ranges for fish that are likely to inhabit [the] area." The literature review did not provide tolerance ranges for specific saltwater fish that live in Blounts Creek, and no one testified at trial regarding the preparation of the literature review or the process for selecting the various studies it relied on. Dr. Overton testified that an appropriate literature review in this context should rely on studies that have sampled the body of water at issue. But CZR's review did not rely on any studies about Blounts Creek's aquatic life. Instead, it cited studies conducted in places such as California, Pennsylvania, New Hampshire, and Canada. Further, as discussed in more depth later, it is impossible to measure species composition, species diversity, functional organization, and population density without habitat-specific sampling. A literature review that hypothesizes which fish may be present in Blounts Creek is not a replacement for a study that determines

which fish are actually present.

After the second CZR report was submitted, the Wildlife Resources Commission notified the Division that it did "not feel" that its "concerns expressed in [its] previous correspondence [had] been adequately addressed." The Commission explained that, through its own sampling efforts, it recorded the "highest [catch per unit effort] of River Herring in years from the Tar-Pamlico system, . . . demonstrat[ing] the importance of Blounts Creek as potential spawning habitat." But the Division did not follow up on the concerns raised by the Commission, nor did it request to see the data the Commission collected. Moreover, Mr. Belnick did not receive feedback on the Commission's comments from Mr. Fleek or anyone else in the biological assessment branch.

On top of all of the issues raised with the studies that the Division relied on, Mr. Fleek provided Mr. Belnick with a final opinion regarding the permit's likely effects on Blounts Creek. Mr. Fleek explained,

> The biota presently found in the Blounts Creek system is adapted to intermittent flow, low pH, and low dissolved oxygen. The proposed discharge will alter the natural physcio-chemical [sic] parameters of this system by changing the flow regime from intermittent to permanent, and by increasing the pH and dissolved oxygen from low to high. As such, many of the taxa currently found in this system which are adapted to the natural condition will be replaced by taxa that are adapted to more permanent flows, higher pH, and higher dissolved oxygen levels. The taxa that are naturally occurring to this type of stream system will be replaced with taxa that are not typical to this type of system. The discharge will promote the presence of taxa that are more indicative of streams which

> have permanent flows, higher pH, and higher dissolved oxygen. *These types of streams, and the taxa which inhabit them, are not normally found in North Carolina's coastal plain.*

(emphasis added). Put simply, the discharge is predicted to replace much of the creek's current aquatic life with life that is adapted to live under post-discharge conditions—life that is "not normally found in North Carolina's coastal plain." The consequences of Mr. Fleek's prediction are plain; if the current taxa of the creek are replaced by taxa that are not normally found in North Carolina's coastal plain, then the discharge has eliminated the ability of Blounts Creek "to support and maintain a balanced and indigenous community of organisms having species composition, diversity, population densities and functional organization similar to that of reference conditions[,]" or the creek's biological integrity. 15A N.C. Admin. Code 2B.0202(11). Mr. Belnick testified that he trusted Mr. Fleek's analysis on this point. But Mr. Belnick did not provide this analysis to Mr. Reeder as part of the materials that Mr. Reeder considered in applying the biological integrity standard and approving the permit.

Despite all of the issues and warnings summarized above, which represent only a few examples of the concerns raised about the methodologies employed and the conclusions reached by the CZR and Kimley-Horn reports, the Division issued the permit without requiring additional sampling that would allow it to confirm whether the permit's predicted consequences have been realized. But more importantly to this appeal, *none* of the testing that the Division relied on answers whether Blounts

Creek's biological integrity, as that term has been defined by 15A N.C. Admin. Code 2B.0202(11), will be maintained under the permit.

As explained previously, 15A N.C. Admin. Code 2B.0211 designates "maintenance of biological integrity" as a best usage that must be protected for Class C waters like Blounts Creek. 15A N.C. Admin. Code 2B.0211(1). And "[b]iological integrity means the ability of an aquatic ecosystem to support and maintain a balanced and indigenous community of organisms having species composition, diversity, population densities and functional organization similar to that of reference conditions." 15A N.C. Admin. Code 2B.0202(11). The only way to determine whether the issuance of a permit maintains "the ability of an aquatic ecosystem" to support and maintain certain biological characteristics "similar to that of reference conditions" is to have some understanding of what those specific reference conditions are.

Despite the clear language of the regulation, no one from the Division defined, measured, provided recommendations on, or otherwise specified the reference conditions of Blounts Creek in terms of its species composition, diversity, population densities, and functional organization, or any other ecological metric, including Mr. Reeder who was responsible for applying the biological integrity standard, Mr. Belnick, the permit's drafter, or Mr. Fleek, the head of the Division's biological assessment branch. In fact, Mr. Reeder testified that he did not "know if there is such a thing" as the biological integrity standard. More troubling still, Mr. Reeder testified

that he did not document any reference conditions that he supposedly relied on in determining whether the permit complied with the biological integrity standard.[7] In short, the Division failed to analyze or determine the creek's reference conditions such that the Division will be able to monitor whether those reference conditions are maintained in compliance with the biological integrity standard.

The Division's failure to evaluate biological integrity before issuing the permit is supported by Mr. Fleek's warning discussed previously that "the taxa which [will] inhabit [the new Blounts Creek system] are not normally found in North Carolina's coastal plain." Again, Mr. Reeder was never informed of this conclusion. Additionally, Mr. Fleek was asked to identify "a stream that is currently what Blounts Creek will look like after the discharge[,]" but he could not find one, including in the Division's own database, which provides data from 150-200 sites per year dating back to 1978.

This means that the discharge is predicted to create an entirely different creek that neither resembles Blounts Creek's current composition nor exists anywhere else in this State's coastal plain. But as the State itself recognizes, "[t]he biological integrity standard safeguards our State's biological resources by prohibiting any discharge that would 'preclude' the 'ability' of an ecosystem to support biological conditions that are 'similar' to 'reference conditions.' " Thus, the result predicted by

---

[7] This is particularly problematic because Mr. Reeder is no longer the director of the Division. Thus, when the time comes to reopen the permit, there will be no documented reference conditions to use in order to determine the permit's impacts on Blounts Creek's biological integrity.

Mr. Fleek would be a plain violation of the Division's own interpretation of the biological integrity standard and the requirement that Blounts Creek's biological integrity be maintained according to its current reference conditions—reference conditions that the Division failed to establish. As a result, the permitted discharge risks deleterious effects on Blounts Creek's current aquatic life as predicted by the Division's biologists, and there will be no way to assess whether this change complies with 15A N.C. Admin. Code 2B.0211 because the Division has refused to collect the data that would show that the creek's biology has been fundamentally altered or eliminated.

In sum, despite the opposition of many of its sister agencies with expertise in the area and warnings from its own scientists, the Division issued the permit based on questionable and insufficient research, ignored counsel that the permitted discharge is expected to fundamentally alter the biological makeup of the creek, failed to communicate that risk to the individual responsible for applying the biological integrity standard, and blinded itself from discovering this consequence in the future. Though the Division should be afforded deference in determining how to appropriately quantify Blounts Creek's reference conditions according to the metrics set forth in 15A N.C. Admin. Code 2B.0202(11), the regulation and its terms must be given some reasonable meaning. Indeed, though "the interpretation of a statute by an agency created to administer that statute is traditionally accorded some deference by appellate courts, those interpretations are not binding. 'The weight of such [an

interpretation] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning[,] . . . and all those factors which give it power to persuade, if lacking power to control.' " *In re North Carolina Savings & Loan League*, 276 S.E.2d at 410 (quoting *Skidmore,* 323 U.S. at 140). Here, however, the record demonstrates that the Division either entirely ignored the biological integrity standard or applied it in a way that conflicts with any logical interpretation of the standard, including its own.

The majority holds that the Division is entitled to deference in its interpretation of 15A N.C. Admin. Code 2B.0202(11) "[g]iven the Division's expertise and conduct in its review of Martin Marietta's permit application." But because the record shows that the Division failed to employ any standard as it was drafting and approving the permit, there is no interpretation to which this Court can afford the Division deference. Even if the Division did attempt to interpret and apply the standard, as the discussion above shows, the attempt would be wholly inadequate as a legal matter. An agency is entitled to deference when it has "demonstrated knowledge and expertise . . . with respect to facts and inferences within the specialized knowledge of the agency." N.C.G.S. § 150B-34(a) (2021). Deference is not warranted when an agency's interpretation is "plainly erroneous or inconsistent with the regulation." *Morrell*, 338 N.C. at 238. Ignoring a regulation or applying such a butchered and legally unsound interpretation that the regulation's protections are rendered impotent, as here, is not a demonstration of agency knowledge and

expertise. It is a demonstration of the dereliction of duty and constitutes plainly erroneous agency conduct.

IV.  **Conclusion**

Because the Division's application of the biological integrity standard, or lack thereof, was plainly erroneous, the ALJ's conclusion otherwise constitutes an error of law, which the Superior Court correctly reversed, applying de novo review. N.C.G.S. § 150B-51(b), (c) (2021). I therefore dissent from the majority's conclusion that the ALJ was correct in concluding that the Division properly interpreted the biological integrity standard in issuing the permit.